**United States District Court**
For the Northern District of California

1
2
3
4
5                         UNITED STATES DISTRICT COURT

6                        NORTHERN DISTRICT OF CALIFORNIA

7

8   ROLAND E. GARCIA,                          No. C-07-2279 EMC

9              Plaintiff,

10        v.                                   **ORDER GRANTING IN PART AND**
                                               **DENYING IN PART DEFENDANTS'**
11  DAVID COLEMAN, *et al.*,                   **MOTION FOR SUMMARY JUDGMENT**

12             Defendants.                     **(Docket No. 46)**
    _____/
13

14

15        Plaintiff Roland Garcia, dba Garcia International Trading ("GIT"), has filed suit against

16  Defendants David Coleman, Ann Coleman, and Amerivine, Inc. for copyright infringement,

17  common law misappropriation, unfair competition (both statutory and common law), fraud,

18  conversion, breach of the implied covenant of good faith and fair dealing, and conspiracy.  Currently

19  pending before the Court is Defendants' motion for summary judgment.  Defendants argue that they

20  are entitled to summary judgment because the majority of claims are barred by the statute of

21  limitations and, even if not, Mr. Garcia has failed to show a genuine dispute of material fact to

22  support any of the claims.  Having considered the parties' briefs and accompanying submissions, as

23  well as the oral argument of counsel and all other evidence of record, the Court hereby **GRANTS** in

24  part and **DENIES** in part Defendants' motion.

25                    **I.    FACTUAL & PROCEDURAL BACKGROUND**

26        Between 1991 and 1994, Mr. Garcia owned and operated a company known as California

27  Wine Country Consultants, Inc. ("CWCCI").  *See* Garcia Decl. ¶ 2.  "CWCCI, located in

28  Healdsburg, California[,] sold wines across the United States via catalogue."  Garcia Decl. ¶ 2.  Mr.

**United States District Court**
For the Northern District of California

1   Garcia was CWCCI's president.  *See* Garcia Decl. ¶ 6.  In September 1993, CWCCI purchased from

2   a photographer all rights to a photograph which depicted a Sonoma ridge ("Sonoma ridge

3   photograph").  *See* Garcia Decl. ¶ 3 & Ex. 1 (bill of sale, dated 9/27/93).  CCWI had previously

4   purchased from the photographer the right to use the Sonoma ridge photograph on its catalogue

5   cover.  *See* Garcia Decl. ¶¶ 3-4 & Ex. 2 (catalogue cover).

6          In 1994, Mr. Garcia decided to close down CWCCI and set up a new business known as

7   Garcia International Trading ("GIT").  *See* Garcia Decl. ¶ 5; *see also* Garcia Depo. at 24 (noting that

8   CWCCI went out of business in 1994).  On January 21, 1994, Mr. Garcia, as president of CWCCI,

9   issued a letter to GIT stating as follows: "[CWCCI] agrees to surrender all rights and copyrights, to

10  'Sonoma Ridge Cellars' and transfer and assign, in lieu of payment of $150.00 for services rendered,

11  these rights and copyrights to [GIT] on this date."  Garcia Decl., Ex. 3.  In his deposition, Mr. Garcia

12  stated that he could not recall ever using the name Sonoma Ridge Cellars in any context.  *See* Garcia

13  Depo. at 54.

14         In 1995, Mr. Garcia began to make inquiries about creating his own label.  *See* Garcia Decl.

15  ¶ 7.  Mr. Garcia's son, Kelly, told Mr. Garcia about Mr. Coleman and his winery Adler Fels.  See

16  Garcia Decl. ¶ 7.  Some time in 1996, Mr. Garcia met with Mr. Coleman to discuss Mr. Garcia's

17  plan to create a brand.  *See* Garcia Decl. ¶ 7; *see also* Coleman Decl. ¶ 5 ("In approximately June

18  1996, Garcia approached me about the possibility of purchasing wine from Adler Fels, custom

19  labeling it with the name 'Sonoma Ridge,' and including a photograph of the vineyards on Westside

20  Road on the label.").

21         Thereafter, Mr. Coleman contacted a label designer that he knew, Michelle LeBlanc, to assist

22  Mr. Garcia.  *See* Garcia Decl. ¶ 8.  Mr. Garcia met with Ms. LeBlanc and, in November 1996, her

23  company provided a mock-up for his review.  *See* Garcia Decl. ¶ 10 & Ex. 5 (mock-up, dated

24  11/96).  The label featured prominently the Sonoma ridge photograph.

25         According to Mr. Garcia, in November 1996, he and Mr. Coleman

26         agreed verbally that [Mr. Coleman] would find the wine [Mr. Garcia]
           wanted and [Mr. Garcia] would buy it from [Mr. Coleman].  [Mr.
27         Garcia was] interested in bottling and exporting Sauvignon Blanc and
           Chardonnay. . . . [Mr. Garcia] agreed to supply [Mr. Coleman with]
28         the labels for [the] Sonoma Ridge brand.  [Mr. Coleman] would get

United States District Court

For the Northern District of California

1    approval for the labels and bottle the wine.  [Mr. Garcia] understood
2    [he was] to pay for the wine before pick-up.

3    Garcia Decl. ¶ 11; *see also* Garcia Depo. at 46-47 ("So the deal with Mr. Coleman was . . . that he

4    would find the wine. . . . [H]e assured me he would find the two wines we wanted, the sauvignon

5    blanc and the chardonnay, and he would bottle it and we would supply the labels, and that was the

6    deal we made.  And he would bill us for the bottled wine with our label on it read to go.  So that was

7    our deal.").

8         According to Mr. Garcia, in November 1996, Mr. Coleman created an invoice -- No. 96-

9    1115 -- from Adler Fels to GIT for 56 cases of Sonoma Ridge Napa Valley Chardonnay and 56

10   cases of Sonoma Ridge North Coast Sauvignon Blanch.  *See* Garcia Decl. ¶ 12 & Ex. 6 (Invoice No.

11   96-1115).  Mr. Garcia claims that the "invoice was a pro forma invoice created well before the wine

12   was actually ready for purchase" and "was never paid as another invoice was created when the

13   [wine] was bottled and ready for shipment in June 1997."  Garcia Decl. ¶ 12.

14        According to Mr. Coleman, well before November 1996, GIT ordered wines from Adler Fels

15   for the Sonoma Ridge label.  Mr. Coleman has provided copies of three invoices (Nos. 96-602, 96-

16   603, 96-604), all dated June 2, 1996, for cases of Sauvignon Blanc and Chardonnay.  *See* Coleman

17   Decl. ¶ 11 & Ex. A (invoices).  Mr. Coleman claims that, in November 1996, it became clear that

18   Mr. Garcia "did not have the finances to pay invoice #96-603 or invoice #96-604," and so Mr.

19   Coleman "negotiated . . . an agreement to relieve him of his obligation to pay the invoices"; in

20   return, "Adler Fels could sell, in the U.S.A., the cases of wine affixed with the Sonoma Ridge labels

21   that [Mr.] Garcia had ordered but failed to pay for."  Coleman Decl. ¶ 13.  According to Mr.

22   Coleman, only after Mr. Coleman relieved Mr. Garcia of this debt did Mr. Garcia then order

23   additional wines which were bottled and shipped in 1997.  *See* Coleman Decl. ¶ 14.  Mr. Garcia

24   disputes that he ever allowed Mr. Coleman to use the Sonoma Ridge label domestically.  *See* Garcia

25   Decl. ¶ 31.

26        In December 1996, Mr. Garcia met with a company about making labels for the Sonoma

27   Ridge wine and received a quote.  *See* Garcia Decl. ¶ 14 & Ex. 7 (quote, dated 12/12/96).  Mr.

28   Garcia asked Mr. Coleman to comment on the quote, *see* Garcia Decl. ¶ 15 & Ex. 8 (fax, dated

United States District Court

For the Northern District of California

12/16/96), and, in response, Mr. Coleman noted, inter alia, that it seemed "high."  Garcia Decl. & Ex. 9 (fax, dated 12/16/96).  Mr. Coleman suggested that Mr. Garcia use a different company instead -- a company by the name of AC Label.  *See* Garcia Decl., Ex. 9; Coleman Decl. ¶ 6 ("I contacted AC Label, a company with which I had a good long-term relation, about pricing for a master run.").

Mr. Garcia met with AC Label and received a quote from the company on March 13, 1997.  *See* Garcia Decl. ¶ 17 & Ex. 10 (quote, dated 3/13/97).  Mr. Garcia apparently decided to move forward with AC Label, and, on or about April 22, 1997, AC Label sent an "Order Acknowledgment" for 25,000 Sonoma Ridge shells and 4,500 imprints.[1]  *See* Garcia Decl. ¶ 19 & Ex. 12 (Order Acknowledgment); *see also* Garcia Decl., Ex. 13 (invoice, dated 5/30/97).  Mr. Garcia claims that he paid all of the money that he owed to AC Label.  *See* Garcia Decl. ¶ 35.  Mr. Coleman claims otherwise and further claims that, "[i]n [an] effort to save [Mr.] Garcia further embarrassment and to make whole a very important supplier, Adler Fels paid the remaining balance to AC Label."  Coleman Decl. ¶ 8.  Mr. Garcia disputes that Mr. Coleman paid AC Label for any labels on behalf of Mr. Garcia.  *See* Garcia Decl. ¶ 35 ("When Coleman says he paid AC Label for the labels, he did not pay *my* debt but in fact I am informed and believe that he paid for additional imprinted inserts when he then affixed on my 'shells'/master labels.") (emphasis added).

In June 1997, Mr. Coleman filed an application for a certification/exemption of label/bottle approval ("COLA") for the Sonoma Ridge 1994 North Coast Sauvignon Blanc with the Bureau of Alcohol, Tobacco, and Firearms ("BATF").  *See* Garcia Decl. ¶ 21 & Ex. 14 (COLA).  Mr. Coleman filed this application on behalf of GIT.  *See* Garcia Decl., Ex. 14.  That application was subsequently approved by the BATF.  *See* Garcia Decl. ¶ 25.

On June 16, 1997, Adler Fels issued an invoice to GIT -- No. 97-621 -- for 56 cases of Sonoma Ridge Sauvignon Blanc and 42 cases of Sonoma Ridge Chardonnay.  *See* Garcia Decl. ¶ 23 & Ex. 15 (invoice, dated 6/16/97).  According to Mr. Garcia, he paid for the wines and had them

---

[1] Three thousand imprints were for the Chardonnay; the remaining 1,500 were for the Sauvignon Blanc.  *See* Garcia Decl., Ex. 12.  The term "shells" refers to masters -- *i.e.*, labels without any information about the particular varietal.  *See* Garcia Depo. at 147.

United States District Court
For the Northern District of California

1    picked up for delivery to GIT's shipper.  *See* Garcia Decl. ¶ 23.  Eventually, the wines were shipped

2    to Germany.  *See* Garcia Decl. ¶ 14.

3         According to Mr. Garcia, GIT's German customers began to sell the Sonoma Ridge wine in

4    the early part of 1998.  *See* Garcia Decl. ¶ 26.  GIT received many complaints from the German

5    customers that the wine was turning bad; GIT therefore decided not to order any more wine from

6    Adler Fels.  *See* Garcia Decl. ¶ 26.  Thus, "[t]he Sonoma Ridge label was put on the back burner."

7    Garcia Decl. ¶ 26.

8         Mr. Garcia claims that, "[s]ometime after June 1997, Defendants stole and converted the

9    approximately 20,500 'Sonoma Ridge' master labels that had remained at AC Label, by directing

10   AC Label to imprint the labels with specific information relating to Coleman's wine."  Garcia Decl.

11   ¶ 29.  Thus, in October 1997, Mr. Coleman sold 28 cases of wine labeled Sonoma Ridge Merlot to a

12   company in Sonoma County called Wines Limited, LLC.  *See* Garcia Decl. ¶ 34 & Ex. 19 (invoice,

13   dated 10/23/97).  According to Mr. Garcia, in March 1998, "[Mr.] Coleman ordered an additional

14   25,000 labels from AC Label, labels again that were identical to my label."  Garcia Decl. ¶ 30; *see*

15   *also* Garcia Decl., Ex. 18 (Sonoma Ridge labels).  Except for the evidence about limited sales to

16   Wines Limited, there is no evidence before the Court as to how much wine Defendants ultimately

17   sold under the Sonoma Ridge brand and where specifically it was sold or distributed.  In his

18   declaration, Mr. Coleman simply states in conclusory terms that there was distribution "throughout

19   the U.S.A. and California."  Coleman Decl. ¶ 18.

20        In November 1997 (*i.e.*, shortly after the sales to Wines Limited), the Colemans vacationed

21   as Mr. Garcia's guests in Mexico.  *See* Garcia Decl. ¶ 32.  According to Mr. Garcia, the Colemans

22   did not say anything about Defendants' use of the Sonoma Ridge labels.

23        In March 1998, Mr. Coleman filed an application to register "Sonoma Ridge" as a trademark

24   in the state of California.  *See* Garcia Decl. ¶ 37.  It appears that the trademark was registered that

25   same month.  *See* Arnone Reply Decl., Ex. B (trademark registration).  In April 1998, Allied

26   Management of New Jersey -- purportedly a business associate of Mr. Coleman -- filed an

27   application to register "Sonoma Ridge" as a trademark with the U.S. Patent and Trademark Office.

28   *See* Garcia Decl. ¶ 37.  Allied's application claimed first use as of November 1997.  *See* Garcia

United States District Court

For the Northern District of California

1   Decl. ¶ 37; Arnone Decl., Ex. D (trademark information).  The trademark was eventually registered

2   on August 24, 2004.  *See* Arnone Decl., Ex. D.

3          In October 1998, the Colemans invited Mr. Garcia and his ex-wife to play in a golf

4   tournament in California.  *See* Garcia Decl. ¶ 33.  According to Mr. Garcia, the Colemans did not

5   say anything about their use of the Sonoma Ridge labels that Mr. Garcia had allegedly paid for, their

6   purchase of more Sonoma Ridge labels from AC Label, or their application -- or Allied's application

7   -- for a trademark for the Sonoma Ridge name.

8          Mr. Garcia claims that, in late 2005, he and his son Kelly decided to use the Sonoma Ridge

9   label again, this time to sell wine domestically.  *See* Garcia Decl. ¶ 26.  According to Mr. Garcia,

10  "[i]n the first few months of 2006, we contacted several different people to assist us with our label

11  and learned that Coleman had been filing COLA's for Sonoma Ridge wine for his *own* account [and

12  not GIT's, since 1998] and selling wine using my label since 1997."  Garcia Decl. ¶ 27 (emphasis

13  added); *see also* Garcia Decl., Ex. 17 (COLAs, dated 3/98 to 12/00).  This lawsuit ensued.

## II.  DISCUSSION

15  A.   Legal Standard

16         Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be rendered "if

17  the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

18  affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

19  party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  An issue of fact is genuine

20  only if there is sufficient evidence for a reasonable jury to find for the nonmoving party.  *See*

21  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  "The mere existence of a scintilla of

22  evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for

23  the [nonmoving party]."  *Id.* at 252.  At the summary judgment stage, evidence must be viewed in

24  the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the

25  nonmovant's favor.  *See id.* at 255.

26         Where the plaintiff has the ultimate burden of proof, the defendant may prevail on a motion

27  for summary judgment simply by pointing to the plaintiff's failure "to make a showing sufficient to

28  establish the existence of an element essential to [the plaintiff's] case."  *Celotex Corp. v. Catrett*,

United States District Court

For the Northern District of California

1  477 U.S. 317, 322 (1986).  But, if the defendant is moving for summary judgment based on an

2  affirmative defense for which it has the burden of proof, the defendant "must establish beyond

3  peradventure *all* of the essential elements of the . . . defense to warrant judgment in [its] favor."

4  *Martin v. Alamo Cmty. College Dist.*, 353 F.3d 409, 412 (5th Cir. 2003) (internal quotation marks

5  omitted; emphasis in original); *see also Kinghorn v. Citibank, N.A.*, No. C 97-3111 FMS, 1999 U.S.

6  Dist. LEXIS 442, at *7-8 (N.D. Cal. Jan. 20, 1999) (noting same).

7  B.    Statute of Limitations

8       In their motion for summary judgment, Defendants assert that all of the causes of action --

9  except for breach of the implied covenant of good faith and fair dealing -- are barred by the statute

10  of limitations since the alleged wrongful conduct occurred in 1997 and 1998.  A claim that a cause

11  of action is barred by the statute of limitations is an affirmative defense.  *See, e.g.*, *Wyatt v. Terhune*,

12  315 F.3d 1108, 1117-18 (9th Cir. 2003) ( "[I]t is well-settled that statutes of limitations are

13  affirmative defenses, not pleading requirements.").  As noted above, ordinarily, a defendant moving

14  for summary judgment based on an affirmative defense "must establish beyond peradventure *all* of

15  the essential elements of the . . . defense to warrant judgment in [its] favor."  *Martin*, 353 F.3d at 412

16  (emphasis in original).  Where, however -- as here -- a plaintiff contends that the statute of

17  limitations is not a bar based on the discovery rule or equitable tolling, the plaintiff bears the burden

18  of proving the applicability of such.  *See, e.g.*, *V.C. v. Los Angeles Unified Sch. Dist.*, 139 Cal. App.

19  4th 499, 516 (2006) ("It is plaintiff's burden to establish facts showing that he was not negligent in

20  failing to make the discovery sooner and that he had no actual or presumptive knowledge of facts

21  sufficient to put him on inquiry.") (internal quotation marks omitted); *United States v. Marolf*, 173

22  F.3d 1213, 1218 n.3 (9th Cir. 1999) ("A court may . . . equitably toll a statute of limitations in the

23  interests of justice, such as when (1) the defendant misleads the plaintiff into allowing the statutory

24  period to expire, or (2) extraordinary circumstances beyond the plaintiff's control make it impossible

25  for him to file suit on time.  The burden is on the plaintiff to show that equitable tolling is

26  appropriate.").  Accordingly, to defeat summary judgment based on the statute of limitations where

27  the limitations period would otherwise have run, Mr. Garcia must establish a genuine dispute of

28  material fact with respect to the discovery rule and/or equitable tolling.

**United States District Court**
For the Northern District of California

1.   <u>Copyright Infringement</u>

The Copyright Act provides that "[n]o civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued."  17 U.S.C. § 507(b). "A cause of action for copyright infringement accrues when one has knowledge of a violation or is chargeable with such knowledge."  *Roley v. New World Pictures, Ltd.*, 19 F.3d 479, 481 (9th Cir. 1994).  Thus, "the statute of limitations does not prohibit recovery of damages incurred more than three years prior to the filing of suit if the copyright plaintiff was unaware of the infringement, and that lack of knowledge was reasonable under the circumstances."  *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 706 (9th Cir. 2004).  Whether a plaintiff's lack of knowledge was reasonable takes into account what a reasonable copyrightholder in the plaintiff's position would have known. *See In re Napster, Inc. Copyright Litig.*, Nos. C MDL-00-1369-MHP, C 04-3004 MHP, 2005 WL 289977, at *4 (N.D. Cal. Feb. 3, 2005) ("[T]he court holds that based on the facts alleged in the complaint, a reasonable copyright owner in plaintiffs' position would have known of both the alleged acts of direct infringement and Hummer's alleged involvement in those acts before July 23, 2001."); *see also Goldberg v. Cameron*, 482 F. Supp. 2d 1136, 1148-49 (N.D. Cal. 2007) ("Plaintiff . . . argu[es] that he 'is a successful song writer and producer in his own right.'  It is unreasonable for a 'successful song writer and producer' who shopped around a movie script and sound track to movie studios to commence a Yoga path only to reemerge from electronic isolation twenty years later and thereafter commence suit for copyright infringement.").  The date of discovery of infringement is an issue of fact.  *See Polar Bear*, 384 F.3d at 707.

According to Defendants, Mr. Garcia's claim is time barred because he did not file suit until April 26, 2007, and therefore only alleged infringements that occurred on or after April 26, 2004, are actionable.  According to Defendants, they discontinued use of the Sonoma Ridge label long before April 2004.  *See* Coleman Decl. ¶ 19 (claiming that they "discontinued use of the Sonoma Ridge label bearing the Photograph in 2003").  In response, Mr. Garcia argues that the copyright infringement claim did not actually accrue until 2006 because that is when he first learned that Defendants were using the infringing label.  Defendants, in turn, argue that Mr. Garcia's lack of knowledge was not reasonable, relying primarily on the fact that Defendants sold the wine with the

**United States District Court**
For the Northern District of California

1   Sonoma Ridge label "to retailers and restaurants throughout the U.S.A. and California, including

2   establishments in Santa Rosa, California where [Mr.] Garcia lived until August 2000." Coleman

3   Decl. ¶ 18; *see also* Garcia Decl. ¶ 34 (stating that, in October 1997, Mr. Coleman sold 28 cases of

4   wine labeled Sonoma Ridge Merlot to a company in Sonoma County called Wines Limited, LLC).

5       Viewing the evidence in the light most favorable to Mr. Garcia and drawing all justifiable

6   inferences in his favor, the Court concludes that a reasonable jury could find that Mr. Garcia's lack

7   of knowledge was reasonable. Although Mr. Coleman claims that wine with the Sonoma Ridge

8   label was sold throughout the United States and California, *see* Coleman Decl. ¶ 18, he says nothing

9   about the amount of wine that was sold, where it was sold and distributed, and so forth. Drawing all

10  inferences in Mr. Garcia's favor, the very limited facts presented here fail to establish as undisputed

11  fact that even a person with the experience in the wine industry possessed by Mr. Garcia would have

12  known about Mr. Coleman's sale of wine with the Sonoma Ridge label.[2] Similarly, while

13  Defendants make much of the fact that there were sales not just in California but in the specific city

14  where Mr. Garcia used to live, there is no evidence that the sales consisted of anything more than the

15  sale of only 28 cases of wine (336 bottles). *See* Garcia Decl. ¶ 34 & Ex. 19 (invoice, dated

16  10/23/97). Furthermore, the extent of Mr. Garcia's knowledge of sales in the United States,

17  including California, was hampered by the fact that he spent every other two weeks in Germany for

18  business during much of this period. *See* Garcia Decl. ¶ 39. *See, e.g.*, *Bibeau v. Pacific Northwest*

19  *Research Found., Inc.*, 188 F.3d 1110 (9th Cir. 1999), *available at* 1999 U.S. App. LEXIS 38092, at

20  *13-14 (acknowledging that there were many published news articles about the experiments that

21  allegedly caused plaintiff's injury but stating that "that doesn't mean that [plaintiff] must be lying

22  about his ignorance, or that a reasonable man would necessarily have discovered the truth," noting

23

24  _____

25       [2] To the extent Defendants argue that a person's involvement in an industry alone can establish
    chargeable knowledge, the Court does not agree. A person's involvement in an industry is a factor to
26  consider and may at times be a significant factor, but alone it is not enough to establish chargeable
    knowledge. The nature and breadth of the infringement must also be considered. *See, e.g.*, *Goldberg*
27  *v. Cameron*, 482 F. Supp. 2d 1136, 1148 (N.D. Cal. 2007) (in case in which plaintiff claimed
    infringement based on the *Terminator* movies, noting that the movies "have been exceedingly popular
28  both domestically and abroad").

9

United States District Court
For the Northern District of California

1  that plaintiff "was employed as a long-haul trucker, and thus was often traveling around the country

2  during the time that a rash of lawsuits over the Heller Experiments were filed in Oregon").

3      Defendants argue still that Mr. Garcia should still be charged with knowledge of their use of

4  the Sonoma Ridge label based on the limited "shelf-life" of the labels.  The evidence before the

5  Court indicates that the labels at issue were "pressure sensitive" labels which used an adhesive that

6  lasted for less than five years.  *See* Coleman Decl. ¶ 9 ("Although the adhesives on the pressure

7  sensitive labels made application to the bottles less costly, the properties of the adhesives limited the

8  useful life of the labels to less than five (5) years.  After the adhesive hardens, the labels become

9  useless.").  According to Defendants, given the limited shelf-life of the labels, Mr. Garcia should

10 have checked on the labels much earlier than 2006.  The problem here is that there is nothing to

11 show that Mr. Garcia knew about the adhesive used on the labels and its properties.  Absent such

12 knowledge, there is nothing that should have prompted Mr. Garcia to check on the labels earlier.

13 Moreover, even if Mr. Garcia had been aware that the labels had a limited shelf life, that would not

14 lead him to suspect Mr. Coleman would take the remaining labels and use them for his own bottles

15 for distribution.  This is particularly true given that, in June 1997, Mr. Coleman filed an application

16 for a COLA for the Sonoma Ridge 1994 North Coast Sauvignon Blanc with the BATF on GIT's

17 behalf -- *i.e.*, on Mr. Garcia's behalf -- and not on behalf of any Defendant.  *See* Garcia Decl. ¶ 21 &

18 Ex. 14 (COLA).  Viewing the facts in Mr. Garcia's favor, Mr. Coleman's filing of the application on

19 Mr. Garcia's behalf might have lulled Mr. Garcia from suspecting that Mr. Coleman would take and

20 use the labels.

21     Finally, Defendants contend that Mr. Garcia should be charged with knowledge of their use

22 of the Sonoma Ridge label based on the trademark registration for the Sonoma Ridge brand with the

23 state of California and with the United States Patent and Trademark Office.  Defendants point out

24 that, under former California Business & Professions Code § 14242 (repealed in 2008),

25 "[r]egistration of a mark with the Secretary of State under this chapter shall be constructive notice of

26 the registrant's claim of ownership thereof."  Cal. Bus. & Prof. Code § 14242 (repealed in 2008).

27 Similarly, under 15 U.S.C. § 1072, "[r]egistration of a mark on the principal register provided by

28 this Act [*i.e.*, the Lanham Act] or under the Act of March 3, 1881, or the Act of February 20, 1905,

10

1   shall be constructive notice of the registrant's claim of ownership thereof."). The Court does not

2   find this argument availing for several reasons.

3        First, Defendants did not raise this argument in its moving papers but raised it for the first

4   time in its reply brief, thus depriving Mr. Garcia of an opportunity to respond on the papers.

5        Second, even if the Court were to consider the merits of this argument, Defendants have

6   cited no authority which has concluded that "constructive notice" for purposes of enforcing the state

7   or federal trademark statutes establishes chargeable knowledge for purposes of the discovery rule.

8   Simply because some courts have referred to "constructive notice" in discussing the discovery rule[3]

9   does not by itself demonstrate an intent to import the meaning of "constructive notice" from the state

10  or federal trademark statutes.

11       Indeed, there is sound reason why "constructive notice" for purposes of the state or federal

12  trademark statutes is not necessarily sufficient to establish chargeable knowledge for purposes of the

13  discovery rule. Under the trademark statutes, a trademark registration gives constructive notice to

14  potential infringers. Before one employs a mark for commercial purposes, he or she can reasonably

15  be expected to conduct due diligence in, *e.g.*, checking whether the mark has already been

16  registered. A good faith defense ought not be available to one who neglects to exercise such a

17  diligence. *See* McCarthy on Trademarks & Unfair Competition § 19:9 (4th ed.) ("A Principal

18  Register registration is constructive notice of a claim of ownership so as to eliminate any defense of

19  good faith adoption and use made after the date of registration."). In the context of the discovery

20  rule, on the other hand, one in Mr. Garcia's position did not have an obvious incentive to conduct

21  such an inquiry. Absent any authority establishing that registration automatically defeats the

22  discovery rule, the Court sees no reason why the issue should not be treated as a factual question as

23  is normally the case. Registration may be a relevant fact but itself is not dispositive. *Cf. Prudential*

24  *Home Mortg. Co. v. Superior Court*, 66 Cal. App. 4th 1236, 1247-48 (1998) (noting that "we have

_____

26      [3] *See, e.g.*, *Parsons v. Tickner*, 31 Cal. App. 4th 1513, 1525 (1995) ("The rule is that the plaintiff
27  must plead and prove the facts showing: (a) Lack of knowledge. (b) Lack of means of obtaining
    knowledge (in the exercise of reasonable diligence the facts could not have been discovered at an earlier
28  date). (c) How and when [s]he did actually discover the fraud or mistake. Under this rule constructive
    and presumed notice or knowledge are equivalent to knowledge.").

United States District Court

For the Northern District of California

1    found no case suggesting the existence of public records precludes the application of the delayed

2    discovery doctrine as a matter of law"; also stating that, "[w]hile public records certainly impart

3    presumptive notice under some circumstances, we decline to hold their mere existence imparts

4    knowledge as a matter of law").

5          Accordingly, the Court rejects Defendants' contention that the copyright infringement claim

6    should be disposed of on summary judgment.  As stated above, a reasonable jury could find that Mr.

7    Garcia's lack of knowledge about the alleged infringement until 2006 was reasonable.

8          2.          Common Law Misappropriation and Fraud

9          A claim for common law misappropriation appears to be subject to a two-year statute of

10   limitations.  *See* Cal. Code Civ. Proc. § 339(1) (providing for a two-year limitations period for "[a]n

11   action upon a contract, obligation or liability not founded upon an instrument of writing"); *see also*

12   *Italiani v. Metro-Goldwyn-Mayer Corp.*, 45 Cal. App. 2d 464, 466-67 (1941) (concluding that claim

13   for misappropriation of literary property or conversion thereof was subject to § 339(1); *see also*

14   *Barton v. New United Motor Mfg., Inc.*, 43 Cal. App. 4th 1200, 1206-07 & n.4 (1996) (explaining

15   that § 339(1) typically applies to tort actions where there have been infringements of property

16   rights).  A claim for fraud is subject to a three-year statute of limitations.  *See* Cal. Code Civ. Proc. §

17   338(d) (providing for a three-year limitations period for "[a]n action for relief on the ground of fraud

18   or mistake").  Similar to above, Defendants assert that both the claims for common law

19   misappropriation and fraud are time barred because the alleged wrongdoing took place well before

20   April 26, 2005, and April 26, 2004, respectively.  *See* Coleman Decl. ¶ 19 (claiming that they

21   "discontinued use of the Sonoma Ridge label bearing the Photograph in 2003").  And similar to

22   above, Mr. Garcia contends that he is not time barred because the claims did not accrue until 2006

23   when he discovered Defendants' use of the Sonoma Ridge labels.

24         Defendants do not dispute that the discovery rule applies to claims for common law

25   misappropriation.  *See also Bernson v. Browning-Ferris Indus.*, 7 Cal. 4th 926, 931 (1994) (noting

26   that, as a general matter, a cause of action accrues on the date of injury but that there is an exception

27   under the common law discovery rule).  Moreover, it is clear that, under the California Code of Civil

28   Procedure, fraud claims are subject to the discovery rule.  *See* Cal. Code Civ. Proc. § 338(d) (stating

United States District Court

For the Northern District of California

1   that a fraud claim "is not deemed to have accrued until the discovery, by the aggrieved party, of the

2   facts constituting the fraud or mistake").  Accordingly, for the reasons discussed above, *see* Part

3   II.B.1, *supra*, a reasonable jury could find that Mr. Garcia's lack of knowledge about the alleged

4   wrongdoing until 2006 was reasonable, and thus summary judgment on this ground must be denied.

5             3.      Unfair Competition (Statutory and Common Law)

6          The statute of limitations for a statutory unfair competition claim is four years.  *See* Cal. Bus.

7   & Prof. Code § 17208 ("Any action to enforce any cause of action pursuant to this chapter shall be

8   commenced within four years after the cause of action accrued.").  It appears that there is a two-year

9   statute of limitations for a claim for common law unfair competition, at least as alleged in the instant

10   case.[4]  Again, Defendants argue that the statute of limitations is a bar for each claim and, again, Mr.

11   Garcia argues otherwise invoking the discovery rule.

12          As Defendants point out, there are cases which have held that claims for statutory unfair

13   competition are not subject to the discovery rule.  *See, e.g.*, *Snapp & Assocs. Ins. Servs. v.*

14   *Robertson*, 96 Cal. App. 4th 884, 891 (2002) (in case involving a claim pursuant to California

15   Business & Professions Code § 17200, stating that the discovery rule "does not apply to unfair

16   competition actions" and that "'the statute begins to run . . . irrespective of whether plaintiff knew of

17   its accrual, unless plaintiff can successfully invoke the equitable tolling doctrine'").  However, the

18   California Supreme Court has stated that this is not settled law.  *See Grisham v. Philip Morris*

19   *U.S.A., Inc.*, 40 Cal. 4th 623, 635 n.7 (2007) (comparing *Snapp* with *Massachusetts Mut. Life Ins.*

20   *Co. v. Superior Court*, 97 Cal.App.4th 1282, 1295 (2002), in which the court stated that the

21   discovery rule "probably" applies).  Moreover, even if it is settled law with respect to claims for

22   statutory unfair competition, it is not clear whether common law claims for unfair competition

23   would be subject to the discovery rule.  Defendants have not cited any authority directly on point.

24

25

---

26        [4] The common law unfair competition claim is essentially the same as the common law
misappropriation claim.  *See* FAC ¶ 58 ("By appropriating Plaintiff's 'SONOMA RIDGE' brand name

27   for their own proprietary wines, Defendants David Coleman and Amerivine have engaged in unlawful,
unfair, and/or fraudulent business acts or practices").  As noted above, it appears that the common law

28   misappropriation claim is subject to a two-year statute of limitations.

**United States District Court**
For the Northern District of California

1    Accordingly, for purposes of this order, the Court assumes that the discovery rule is

2    applicable, both to claims for statutory and unfair competition, and the Court shall not grant

3    summary judgment on this ground.  However, for the reasons discussed below, summary judgment

4    is appropriate on another ground.

5         4.    Conversion[5]

6    There is a three-year limitations period for a conversion claim.  *See* Cal. Code Civ. Proc. §

7    338(c) (providing for a three-year limitations period for "[a]n action for taking, detaining, or injuring

8    any goods or chattels, including actions for the specific recovery of personal property"); *Bono v.*

9    *Clark*, 103 Cal. App. 4th 1409, 1432 (2002) (stating that there was a three-year statute of limitations

10   for plaintiff's claim of conversion pursuant to § 338(c)); *Snapp*, 96 Cal. App. 4th at 892 n.2 (same).

11   As above, Defendants assert that the conversion claim is time barred, and Mr. Garcia disputes such

12   based on the discovery rule.

13   To the extent there is a discovery rule for conversion claims under California law, it appears

14   to be limited in nature.  The conventional discovery rule does not apply.  As one state court has

15   noted, the rule is applicable

16        only . . . when the defendant in a conversion action fraudulently
          conceals the relevant facts or where the defendant fails to disclose
17        such facts in violation of his or her fiduciary duty to the plaintiff.  In
          those instances, "the statute of limitations does not commence to run
18        until the aggrieved party discovers or ought to have discovered the
          existence of the cause of action for conversion."

19

20   *AmerUS Life Ins. Co. v. Bank of Am., N.A.*, 143 Cal.App.4th 631, 639 (2006).  *See also Strasberg v.*

21   *Odyssey Group*, 51 Cal. App. 4th 906, 916 (1996) ("'Ordinarily the statute of limitations applying in

22   conversion actions . . . begins to run from the date of the conversion even though the injured person

23   is ignorant of his rights.  This rule, however, is not absolute; for example, where there has been a

24   fraudulent concealment of the facts the statute of limitations does not commence to run until the

25   _____

26        [5] At the hearing, Mr. Garcia explained that the conversion claim is based on the alleged theft of
     the wine labels (*i.e.*, tangible property) that Defendants used.  In contrast, the misappropriation claim
27   is based on the alleged misappropriation of the Sonoma Ridge brand name (*i.e.*, intangible property).
     Given Mr. Garcia's comments at the hearing, the Court understands Mr. Garcia to have given up any
28   claim for misappropriation based on misappropriation of tangible property.  *See* FAC ¶ 43 (claiming
     misappropriation of not only the Sonoma Ridge brand name but also the master printing plates).

United States District Court

For the Northern District of California

aggrieved party discovers or ought to have discovered the existence of the cause of action for conversion.").[6]  Accordingly, the applicable standard for deferring accrual of the limitations period is fraudulent concealment.[7]

There is no real dispute that, in the instant case, Defendants did not make any affirmative misrepresentations to Mr. Garcia about their use of the Sonoma Ridge labels.  Rather, Mr. Garcia's contention is that Defendants should have told him about their use of the labels but did not.  Defendants in turn argue that they cannot be charged with fraudulent concealment because they had no duty to disclose that information in the first place.  *Cf. Rutledge v. Boston Woven Hose & Rubber Co.*, 576 F.2d 248, 250 (9th Cir. 1978) ("To avoid the bar of limitation by invoking the concept of fraudulent concealment, the plaintiff must allege facts showing affirmative conduct upon the part of the defendant which would, under the circumstances of the case, lead a reasonable person to believe that he did not have a claim for relief.  Silence or passive conduct of the defendant is not deemed fraudulent, unless the relationship of the parties imposes a duty upon the defendant to make disclosure.").

In his opposition, Mr. Garcia implicitly argues that there was a duty to disclose based on his and his wife's friendship with the Colemans and his business dealings with Defendants.  *See* Opp'n at 9 ("[Mr.] Garcia had no reason to investigate the actions of his trusted friend [Mr. Coleman] with whom he was also doing business.").  Although the existence of a confidential or fiduciary relationship sufficient to impose a duty to disclose is typically a question of fact, *see O'Neil v. Spillane*, 45 Cal. App. 3d 147, 153 (1975); *Kudokas v. Balkus*, 26 Cal. App. 3d 750, 751 (1972), the

---

[6] There is a broader discovery rule when there is a theft of "any article of historical, interpretive, scientific, or artistic significance."  Cal. Code Civ. Proc. § 383(c) ("An action for taking, detaining, or injuring any goods or chattels, including actions for the specific recovery of personal property.  The cause of action in the case of theft, as defined in Section 484 of the Penal Code, of any article of historical, interpretive, scientific, or artistic significance is not deemed to have accrued until the discovery of the whereabouts of the article by the aggrieved party, his or her agent, or the law enforcement agency that originally investigated the theft.").  There is no allegation that any such article is at issue in the instant case.

[7] Fraudulent concealment can also be a basis for equitable tolling.  *See, e.g., Bernson*, 7 Cal. 4th at 931 (1994) (noting that fraudulent concealment is a well-established ground for equitable tolling).

United States District Court

For the Northern District of California

1   Court concludes that no reasonable jury could find that there was such a relationship based on the

2   evidence of record.

3       The mere fact of friendship -- by itself -- is not enough to establish a confidential

4   relationship.  *See Schultz v. Steinberg*, 182 Cal. App. 2d 134, 138 (1960) ("[T]he plaintiff has utterly

5   failed to establish that the evidence proves anything more than a friendship between him and the

6   defendant . . . . 'In the absence of a showing of the exercise of undue influence mere friendship does

7   not constitute a confidential relationship.'"); *see also Ampuero v. Luce*, 68 Cal. App. 2d 811, 819

8   (1945) ("'It is not every case where parties trust each other that the law recognizes as

9   confidential.'").  A confidential relationship may arise where one party is in such a position of

10  confidence and trust with respect to the other that he or she is in a position to exercise and does in

11  fact exercise undue influence.  For example, in *Pryor v. Bistline*, 215 Cal. App. 2d 437 (1963), the

12  court concluded that there was a confidential relationship between the plaintiff, an elderly woman,

13  and her nephew where, even though prior dealings between the two had been very limited, the

14  plaintiff fell severely ill and the defendant, while purporting to take care of her, took advantage of

15  her situation and managed to get her to transfer a substantial part of her assets to him.  Stated

16  differently, a confidential relationship may arise where "one party gains the confidence of the other

17  and purports to act or advise with the other's interests in mind."  *Estate of Sanders*, 40 Cal. 3d 607,

18  615 (1985).  In *Sanders*, the court concluded that there was a confidential relationship between the

19  plaintiffs and the defendant -- all relatives -- where the defendant was the executor of an estate for

20  which the plaintiffs were beneficiaries and where the plaintiffs regularly inquired about probate

21  proceedings and the defendant made repeated assurances which led them to believe the will offered

22  for probate would leave the estate to them, all the while concealing that he had instructed the

23  decedent to change her will to make him the beneficiary.

24      In short, mere friendship is not enough.  The above cases all entail the gaining of trust and

25  the exertion of undue influence in capitalizing on that trust.

26      The instant case does not meet this criterion.  Although the evidence indicates that the

27  Garcias and Colemans were friends, there is nothing to indicate that the friendship was one where

28  Defendants had gained special trust and exercised undue influence.  Although the Garcias and

United States District Court

For the Northern District of California

1   Colemans shared a common interest and occasionally vacationed together, *see* Garcia Decl. ¶¶ 32-33

2   (stating that, in November 1997, the Colemans vacationed with the Garcias in Mexico as guests of

3   the Garcias and that, in October 1998, the Garcias participated in a golf tournament at the Colemans'

4   invitation), this friendship was not particularly remarkable or intimate.  *Compare O'Neil*, 45 Cal.

5   App. 3d at 153 (noting that "intimate relationship between the parties was not of recent origin, but

6   rather of long duration, dating back to a friendship between [defendant-wife's] mother and

7   [plaintiff]").

8        While a business relationship may give rise to a fiduciary duty in some circumstances, no

9   such duty obtains in this case where the parties were engaged in arm's length transactions.  *See*

10  *Kudokas*, 26 Cal. App. 3d at 750-51 (noting that, in buying certain property from cross-defendant,

11  cross-plaintiffs relied primarily on their own judgment and not that of cross-defendant; adding that

12  cross-defendant did not assume the role of adviser to cross-plaintiffs so that "[t]he trial court was

13  fully justified in viewing the sale as an arm's-length transaction between the seller and self-reliant

14  buyers").  Moreover, although the evidence indicates that Mr. Coleman made business

15  recommendations to Mr. Garcia (*e.g.*, who to use as a label designer, who to buy labels from) and

16  engaged in action for Mr. Garcia's benefit (*e.g.*, filing the COLA), this was not a relationship where

17  Mr. Coleman played a special advisory, fiduciary-like role with respect to Mr. Garcia.

18       In short, Mr. Garcia has not cited any case finding a duty to disclose where there is nothing

19  more than an arm's length business transaction coupled with causal friendship.  Because no

20  reasonable jury could find that Mr. Garcia and any Defendant had a confidential or fiduciary

21  relationship, Defendants did not have any duty to disclose Mr. Coleman's use of the labels.  Without

22  such a duty Mr. Garcia's claim that the statute of limitations for the conversion claim should be

23  deferred or tolled based on fraudulent concealment must be rejected.  Therefore, the Court grants

24  summary judgment as to the conversion claim.

25       5.   <u>Conspiracy</u>

26       "Civil conspiracy is not a separate and distinct cause of action under California law.  Instead,

27  it is 'a legal doctrine that imposes liability on persons who, although not actually committing a tort

28  themselves, share with the immediate tortfeasors a common plan or design in its perpetration.'"

*Mintel Learning Tech., Inc. v. Beijing Kaidi Educ. & Tech. Dev. Co., Ltd.*, No. C 06-7541 PJH, 2007 U.S. Dist. LEXIS 59946, at *11 (N.D. Cal. Aug. 9, 2007) (quoting *Applied Equip. Corp. v. Litton Saudi Arabia*, 7 Cal. 4th 503, 510-11 (1994)).  Because there are at least some state law claims that are not barred by the statute of limitations, liability based on the conspiracy doctrine is still possible.[8]

      6.   Summary

      For the reasons stated above, the Court -- with one exception -- rejects Defendants' contention that Mr. Garcia's claims as a matter of law must be dismissed based on the statute of limitations.  The one exception is the conversion claim.  For the conversion claim, the Court concludes that no reasonable jury could find that there was a confidential relationship between Mr. Garcia and Defendants such that Defendants had a duty to disclose their use of the Sonoma Ridge labels and that their failure to disclose constituted fraudulent concealment.  Hence there is no basis for deferring or tolling the statute of limitations on the conversion claim.

C.   Merits Analysis

      Having addressed the statute-of-limitations issue, the Court now turns to the merits of Mr. Garcia's claims and asks whether, as Defendants maintain, Mr. Garcia has failed to show a genuine dispute of material fact to support any of his claims for relief.

///

///

///

///

///

---

     [8] To the extent Mr. Garcia alleges a civil conspiracy claim based on copyright infringement, that claim is preempted.  *See RDF Media Ltd. v. Fox Broad. Co.*, 372 F. Supp. 2d 556, 565-66 (C.D. Cal. 2005) (indicating that unfair competition and civil conspiracy claims based on copyright infringement were preempted because they did not contain extra elements beyond the basic elements of copyright and did not protect rights qualitatively different from those protected by copyright); *Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1193-94 (C.D. Cal. 2001) (noting that "Plaintiffs' Eleventh Claim for Relief, for Civil Conspiracy, is largely just a restatement of Plaintiffs' prior (FAC) 'conspiracy to infringe copyright' claim, which was already dismissed with prejudice by this Court"; then concluding that "[t]he Eleventh Claim for Relief is clearly preempted . . . to the extent it attempts to seek liability under this alternate theory for the same conduct challenged under copyright").

United States District Court

For the Northern District of California

1     1.     <u>Copyright Infringement</u>

2          Defendants argue that they should be awarded summary judgment on the copyright

3     infringement claim because there is no genuine dispute that Mr. Garcia is not the owner of the

4     Sonoma Ridge photograph.[9]

5          Defendants admit that the photographer of the Sonoma Ridge photograph -- *i.e.*, the original

6     owner of the photograph -- properly sold the photograph to CCWI.  Defendants further admit that, in

7     a letter to GIT dated January 21, 1994, Mr. Garcia, as president of CWCCI, stated that "[CWCCI]

8     agrees to surrender all rights and copyrights, to 'Sonoma Ridge Cellars' and transfer and assign, in

9     lieu of payment of $150.00 for services rendered, these rights and copyrights to [GIT] on this date."

10    Garcia Decl., Ex. 3.  Defendants argue, however, that the transfer agreement failed to meet the

11    requirements of 17 U.S.C. § 204(a) and is therefore invalid.  *See* 17 U.S.C. § 204(a) ("A transfer of

12    copyright ownership, other than by operation of law, is not valid unless an instrument of

13    conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the

14    rights conveyed or such owner's duly authorized agent.").  According to Defendants, the "critical

15    flaw" in the transfer agreement from CWCCI to GIT is "the absence of any reference to the [Sonoma

16    ridge] Photograph.  At his deposition, [Mr.] Garcia admitted that 'Sonoma Ridge Cellars' was

17    simply a name owned by CWCCI that was never used in any context."  Mot. at 11.

18         Defendants' argument is not persuasive.  Based on the letter that Mr. Garcia wrote on behalf

19    of CWCCI, there is no doubt that CWCCI meant to transfer something to GIT.  The only issue is

20    whether the copyright to the Sonoma ridge photograph was included as part of the transfer.  A

21    reasonable jury could find that it was, and this precludes summary judgment.

22         The letter is arguably ambiguous.  Its language is broad enough to encompass the photograph

23    copyright.  As an ambiguous document, extrinsic evidence is admissible to aid in its interpretation.

24    *See Friedman v. Stacey Data Processing Services, Inc.*, No. 89 C 4444, 1990 U.S. Dist. LEXIS

25    14621, at *17 (N.D. Ill. Oct. 31, 1990) (holding that "extrinsic evidence of the type generally

26

27         [9] Given the correspondence between Mr. Garcia's counsel and the U.S. Copyright Office, there
      should be no dispute that the only work that is copyrighted is the Sonoma Ridge photograph itself.  *See*
28    Arnone Decl., Exs. E-G.

**United States District Court**

For the Northern District of California

1   allowed with respect to ambiguous contracts shall be relevant in determining whether the contract

2   assigned the copyright"); *Bieg v. Hovnanian Enters., Inc.*, 157 F. Supp. 2d 475, 480 (E.D. Pa. 2001)

3   (in case involving transfer of copyright, noting that, "[w]hen interpreting facially ambiguous

4   documents, some courts have looked to the surrounding circumstances to clarify the intent of the

5   parties").  Mr. Garcia has stated in a declaration that, through the letter, he intended to "convey[] all

6   rights, including copy rights to the [Sonoma Ridge] brand, then called Sonoma Ridge Cellars."

7   Garcia Decl. ¶ 6.

8          It is also significant that CWCCI -- or rather, no one purporting to speak for CWCCI as it is

9   now a defunct business -- is claiming that there was no valid transfer of the copyright to the

10  photograph at issue.  *See Radio TV Espanola S.A. v. New World Entertainment, Ltd.*, 183 F.3d 922,

11  929 (9th Cir. 1999) (indicating that, "in situations 'in which the copyright holder appears to have no

12  dispute with its licensee on [the issue of transfer], it would be anomalous to permit a third party

13  infringer to invoke this provision against the licensee'").  This is not surprising since there is no

14  obvious reason why the parties would have intended to exclude the copyright from the transfer of

15  rights.

16          2.      Common Law Misappropriation

17          As a preliminary matter, the Court notes that it is not entirely clear from Mr. Garcia's papers

18  what property was allegedly misappropriated.  In his complaint, he indicates that the property that

19  was allegedly misappropriated was (1) the master printing plates for the Sonoma Ridge labels and

20  (2) the Sonoma Ridge brand name itself.  *See* FAC ¶ 45.  However, in his opposition to the motion

21  for summary judgment, Mr. Garcia refers to the misappropriation of the Sonoma Ridge labels.  *See*

22  Opp'n at 16.  At the hearing, the Court asked for clarification.  Mr. Garcia responded that the

23  misappropriation claim was asserted with respect to the Sonoma Ridge brand name only.  *See* note 5,

24  *infra*.

25          With respect to this alleged misappropriation, Defendants argue that they should be awarded

26  summary judgment because "the misappropriation doctrine cannot be used in ordinary trademark

27

28

United States District Court

For the Northern District of California

1  infringement cases as a shortcut around the trademark law's standards of protection."[10]  Mot. at 15

2  (citing McCarthy treatise in support).  As Defendants note, the McCarthy treatise does state that

3            [t]he misappropriation doctrine cannot be used in ordinary trademark
           infringement cases as a shortcut around the trademark law's standards
4          of protection.  That is, one cannot dispense with the carefully
           constructed requirements for trademark protection by blithely claiming
5          that defendant "misappropriated" some symbol of plaintiff which may
           or may not be capable of trademark protection.

6

7  2 McCarthy on Trademarks and Unfair Competition § 10:72 (4th ed. 2008).  The treatise goes on to

8  say that "it is a misnomer to talk of 'misappropriation' of trademarks or trade symbols of any type"

9  and further states that "courts have recognized that if plaintiff has failed under classic trademark law

10 to prove trademark ownership and infringement, then plaintiff cannot claim that defendant has

11 'misappropriated' the labor expended in creating the 'trademark.'" *Id.*

12        One of the cases that the treatise cites in support is *Toho Co. v. Sears, Roebuck & Co.*, 645

13 F.2d 788 (9th Cir. 1981).  There, the Ninth Circuit took note that

14           [t]he California doctrine of misappropriation prohibits the substantial
           copying of another's commercial labors even when there is *no*
15         likelihood of confusion.  It has been applied to record and tape piracy.
           There is no similar substantial taking by [the defendant] in this case.
16         The only "taking" [the plaintiff] alleges relates to [the defendant's] use
           of its trademark, and [the plaintiff] cites no cases extending the
17         misappropriation theory to trademark infringement.  We believe that
           California courts would refuse to make such an extension.

18

19 *Id.* at 794 (emphasis added).

20        Although the Ninth Circuit's decision in *Toho* supports Defendants' position, the California

21 courts have held there is in fact a claim for misappropriation for a trade name so long as there *is*

22 some likelihood of confusion.  As discussed in greater detail below, the common law of

23 misappropriation is rooted in the common law test of unfair competition which addresses the act of

24 "passing off" one's goods as those of another, *see United States Golf Ass'n v. Arroyo Software

25 Corp.*, 59 Cal. App. 4th 607, 618 (1999), interests parallel to those protected by trademark statutes.

26

27        [10] Defendants also contend that Mr. Garcia cannot bring such a trademark infringement claim
    because he abandoned the brand name, and now Allied, and not he, owns the trademark for the name.
28 *See* Mot. at 15.  The Court need not address this argument for the reasons discussed below.

United States District Court

For the Northern District of California

1    *Cf. Tomlin v. Walt Disney Prods.*, 18 Cal. App. 3d 226, 236 (1971) (in an unfair competition case in

2    which the plaintiff was trying to bar the defendant from use of the title "The Love Bug," indicating

3    that the plaintiff needed to show a likelihood of public confusion for either injunctive relief or

4    damages).  The Witkin treatise also indicates that a claim for misappropriation of a trade name is

5    possible, again, so long as there is a likelihood of confusion.  It notes as follows:

6              Where no valid trademark, copyright, or patent exists in a particular
              name or design, one producer may freely copy the goods of another or
7              use the same business name if no deception is involved.  But if the
              goods or services are known to the public by that name, design, or
8              physical appearance, an imitation that has the effect of deceiving
              purchasers as to the origin of the goods or services may be enjoined as
9              unfair competition.

10    13 Witkin, Summ. of Cal. Law, Equity § 98 (10th ed. 2005).

11              In light of *United States Golf Association*, *Tomlin* and Witkin, the Court rejects Defendants'

12    contention that a claim for common law misappropriation of a brand name is not legally possible.[11]

13    California common law does afford protection even if the protected interests are akin to those

14    protected by trademark law.

15              At the hearing, Mr. Garcia initially acknowledged that in order to have a claim for

16    misappropriation of a trade name, he needed to demonstrate a likelihood of confusion.  Later, Mr.

17    Garcia backtracked and argued that likelihood of confusion was not necessary because case law

18    describes the elements of a claim for common law misappropriation as requiring only that:

19              (a) the plaintiff invested substantial time, skill or money in developing
              its property; (b) the defendant appropriated and used the plaintiff's
20              property at little or no cost to the defendant; (c) the defendant's
              appropriation and use of the plaintiff's property was without the
21              authorization or consent of the plaintiff; and (d) the plaintiff can
              establish that it has been injured by the defendant's conduct.

22

23    *United States Golf Ass'n*, 69 Cal. App. 4th at 618.

24    _____

25              [11] Defendants do not appear to be making any preemption argument here -- *i.e.*, an argument that
    the misappropriation claim is preempted by trademark law.  To the extent that Defendants are, that
26    argument would not have much merit.  *See Golden Door, Inc. v. Odisho*, 646 F.2d 347, 352 (9th Cir.
    1980) (indicating that there is no preemption by the Lanham Act so long as the state law does not
27    conflict with the federal law; also indicating that there is no conflict where state law, like the Lanham
    Act, "protects both the public from confusion about the services and products it is receiving and the
28    public relations investment of plaintiff").

United States District Court

For the Northern District of California

1    The Court is not persuaded.  First, as noted above, common law misappropriation is simply a

2  subset of unfair competition, *see id.* ("Common law misappropriation is one of a number of

3  doctrines subsumed under the umbrella of unfair competition"), and "[t]he common law tort of

4  unfair competition is generally thought to be synonymous with the act of 'passing off' one's goods

5  as those of another."  *Bank of the W. v. Superior Court*, 2 Cal. 4th 1254, 1263 (1992) (adding that,

6  "[a]ccording to some authorities, the tort also includes acts analogous to 'passing off,' such as the

7  sale of confusingly similar products, by which a person exploits a competitor's reputation in the

8  market"; *see also Cel-Tech Comms. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163 (1999) (Kennard, J.,

9  dissenting) (stating that "deceptive conduct has remained at the heart of unfair competition").  If the

10 broad category of unfair competition requires a likelihood of confusion, then the same must be true

11 of the narrower subset of common law misappropriation.

12    Second, while the elements of the common law misappropriation claim have been listed as

13 above in *Golf*, when the specific property at issue is a trade name or something comparable, the

14 courts have consistently required a likelihood of confusion.  *See, e.g.*, *Tustin Community Hosp., Inc.*

15 *v. Santa Ana Community Hosp. Ass'n*, 89 Cal. App. 3d 889, 893 (1979) (taking note of trial court's

16 conclusion that defendant's use of trade name constituted unfair competition with plaintiff because

17 the name of defendants' hospital was confusingly similar to the name of plaintiff's hospital); *Tomlin*,

18 18 Cal. App. 3d at 236 (in an unfair competition case in which the plaintiff was trying to bar the

19 defendant from use of the title "The Love Bug," indicating that the plaintiff needed to show a

20 likelihood of public confusion for either injunctive relief or damages).  While *Golf* did not explicitly

21 address the issue of likelihood of confusion, it had no occasion to since the issue in *Golf* was

22 whether, in a misappropriation claim, there needed to be "proof of direct competition between the

23 plaintiff and the defendant."  *Golf*, 69 Cal. App. 4th at 618.

24    Finally, the *Golf* court did note that the trial court specifically found

25           that [the defendant's] unauthorized use of [the plaintiff's] service
              marks in its advertising, packaging and instructional materials created
26           a likelihood of confusion by conveying to the general public that [the
              plaintiff] had authorized and approved [the defendant's] use of the
27           Handicap System, and found that [the defendant's] disclaimers were
              "ineffectual" and "ambiguous."

28

1    *Id.* at 615.  The requirement of likelihood of consumer confusion is entirely consistent with the last

2    element in *Golf* -- injury resulting from defendant's conduct.

3         Based on the record before it, Mr. Garcia's misappropriation claim must fail because there is

4    no genuine dispute of fact as to whether "there was a likelihood of confusion in the mind of the

5    public between his [wine] and [Defendants' wine]," an essential element of the claim.  *Tomlin*, 18

6    Cal. App. 3d at 236.  Although the Sonoma Ridge labels used by Defendants were identical to those

7    used by Mr. Garcia and for the same type of product (*i.e.*, wine), there is no record evidence

8    supporting a finding of a likelihood of confusion.  Mr. Garcia sold the Sonoma Ridge wines for a

9    short time in Germany only (*i.e.*, targeting German customers only).  He established no presence in

10   California or the United States and thus had no evidence that local consumers had any knowledge of

11   his wine.  Defendants sold the Sonoma Ridge wines in the United States only (*i.e.*, targeting U.S.

12   customers only).  There is no evidence of any overlap in customers or convergence in the channels

13   of distribution and marketing.  *See M2 Software, Inc. v. Madacy Entm't*, 421 F.3d 1073, 1083 (9th

14   Cir. 2006) (stating that one factor to consider in determining whether there is a likelihood of

15   confusion is whether marketing channels converge, with convergent channels increasing the

16   likelihood of confusion); *see also Century 21 Real Estate Corp. v. Lendingtree, Inc.*, 425 F.3d 211,

17   239 n.18 (3d Cir. 2005) (Fisher, J., concurring in part and dissenting in part) (noting that "[t]he more

18   the parties' services, customers, advertising, or markets diverge, the more they reduce the likelihood

19   of confusion . . . because differently targeted consumers may see the marks in different contexts,

20   through different advertising, and in relation to different goods or services").  *Compare, e.g.*, *Sutter*

21   *Home Winery, Inc. v. Madrona Vineyards, L.P.*, No. C 05-0587 MHP, 2005 U.S. Dist. LEXIS 4581,

22   at *32 (N.D. Cal. Mar. 23, 2005) (noting that "both parties to the instant action sell wine, [but] there

23   are substantial differences in how they go about the task of doing so," with the differences

24   "reflect[ing] the fact that plaintiff operates a large winery that sells and distributes multiple brands of

25   wine throughout the United States, whereas defendant is a family winemaker whose marketing

26   ///

27   ////

28   ///

**United States District Court**
For the Northern District of California

1  literature emphasizes its 'commitment to small-batch, high-integrity winemaking'").[12]  Notably,

2  there is no evidence of any actual confusion either.  *See M2*, 421 F.3d at 1082 (stating that

3  "'[e]vidence that use of the two marks has already led to confusion is persuasive proof that future

4  confusion is likely'").

5        The Court therefore rejects Mr. Garcia's position and finds summary judgment appropriate

6  on the claim for common law misappropriation based on the lack of evidence of a likelihood of

7  confusion.

8        3.     <u>Common Law Unfair Competition</u>

9        Summary judgment is proper with respect to the claim for common law unfair competition

10  for the same reasons discussed above in Part II.C.2, *supra* -- *i.e.*, based on the record submitted, no

11  reasonable jury could find a likelihood of confusion.

12        4.     <u>Statutory Unfair Competition (Cal. Bus. & Prof. Code § 17200)</u>

13        Statutory unfair competition bars (1) unlawful, (2) unfair, or (3) fraudulent business

14  practices.  *See* Cal. Bus. & Profs. Code § 17200.

15        As Defendants point out, Mr. Garcia does not have any claim for an *unfair* business practice

16  by Defendants since, in a suit between competitors (as opposed to a consumer suit), the California

17  Supreme Court has held that the word "unfair" "'means conduct that threatens an incipient violation

18  of an antitrust law, or violates the policy or spirit of one of those laws because its effects are

19  comparable to or the same as a violation of the law, or otherwise significantly threatens or harms

20  competition.'"  *Van Slyke v. Capital One Bank*, No. C 07-00671 WHA, 2007 U.S. Dist. LEXIS

21  82690, at *32 (N.D. Cal. Nov. 7, 2007) (quoting *Cel-Tech*, 20 Cal. 4th at 186-87).

22        Section 17200, however, also prohibits fraudulent or unlawful business practice.  "The term

23  'fraudulent' as used in section 17200 does not refer to the common law tort of fraud but only

24  requires a showing members of the public are likely to be deceived."  *Puentes v. Wells Fargo Home*

---

[12] *See Mallard Creek Indus. v. Morgan*, 56 Cal. App. 4th 426, 435 (1997) ("[C]ourts have held the federal 'likelihood of confusion' standard applies equally to claims under California law [for trademark infringement and unfair competition]. . . . [T]he ultimate test under both federal and California law is whether the similarity between the two marks is likely to deceive or confuse the public.").

United States District Court

For the Northern District of California

*Mortgage, Inc.*, 160 Cal. App. 4th 638, 645 (2008) (internal quotation marks omitted); *see also Bank of the W. v. Superior Court*, 2 Cal. 4th 1254, 1267 (1992) ("[T]o state a claim under [§ 17200] one need not plead and prove the elements of a tort.  Instead, one need only show that 'members of the public are likely to be deceived.'").  Here, absent any likelihood of consumer confusion, Plaintiff has failed to demonstrate how this element may be satisfied.

Unlawful conduct is defined as "any practices forbidden by law, be it civil, criminal, federal, state, or municipal, statutory, regulatory, or court-made."  *Saunders v. Superior Court*, 27 Cal. App. 4th 832, 838-39 (1994).  In the instant case, Mr. Garcia's complaint asserts that there was unlawful conduct based on the misappropriation of the Sonoma Ridge brand name.  *See* FAC ¶ 51 ("By appropriating Plaintiff's 'SONOMA RIDGE' brand name for their own proprietary wines, Defendants David Coleman and Amerivine have engaged in unlawful, unfair, or fraudulent business acts or practices . . . .").  As discussed above, the misappropriation claim requires that there be a likelihood of confusion on the part of the public.  As Mr. Garcia failed to establish a genuine dispute of material fact that there was a likelihood of confusion, summary judgment must be granted on this claim for statutory unfair competition.

     5.    <u>Fraud</u>

Under California law, "[t]he elements of fraud are: (1) a misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (or scienter); (3) intent to defraud, *i.e.*, to induce reliance; (4) justifiable reliance; and (5) resulting damage."  *Robinson Helicopter Co., Inc. v. Dana Corp.*, 34 Cal. 4th 979, 990 (2004).  In his complaint, Mr. Garcia alleges that all Defendants engaged in fraud by concealing from him the fact that they had stolen and converted the Sonoma Ridge brand name and wine label design to produce, manufacture, distribute and sell wines for their own account in the United States.  *See* FAC ¶ 65.  Defendants argue that they are entitled to summary judgment on the fraud claim because there is no genuine dispute that, *inter alia*, any reliance by Mr. Garcia was not reasonable.

Although Defendants focus on whether the reliance was reasonable, the bigger problem for Mr. Garcia is whether there was any reliance at all.  "Reliance exists when the misrepresentation or nondisclosure was an immediate cause of the plaintiff's conduct which altered his or her legal

United States District Court

For the Northern District of California

relations, and when without such misrepresentation or nondisclosure he or she would not, in all

reasonable probability, have entered into the contract or other transaction." *Alliance Mortgage Co.*

*v. Rothwell*, 10 Cal. 4th 1226, 1239 (1995).  In the instant case, there is no genuine dispute of

material fact that the concealment by Defendants was not the reason why Mr. Garcia was not using

the Sonoma Ridge name.  In his declaration, Mr. Garcia states that GIT received many complaints

from the German customers that the Sonoma Ridge wine was turning bad and that GIT therefore

decided not to order any more wine from Adler Fels.  *See* Garcia Decl. ¶ 26.  "The Sonoma Ridge

label was put on the back burner."  Garcia Decl. ¶ 26.

Not only is reliance lacking, but as demonstrated above, there was no affirmative

misrepresentation and no viable claim for fraudulent concealment in the absence of a duty to

disclose.

Accordingly, summary judgment is granted on Mr. Garcia's claim for fraud.

6.    Breach of Implied Covenant of Good Faith and Fair Dealing

The covenant of good faith and fair dealing is implied by law in every contract.  *See Guz v.*

*Bechtel National, Inc.*, 24 Cal. 4th 317, 349 (2000).  The California Supreme Court has explained

that the covenant exists

> to prevent one contracting party from unfairly frustrating the other
> party's right to receive the benefits of the agreement actually made.
> The covenant thus cannot be endowed with an existence independent
> of its contractual underpinnings.  It cannot impose substantive duties
> or limits on the contracting parties beyond those incorporated in the
> specific terms of their agreement.

*Id.* at 349-50 (emphasis and internal quotation marks omitted).  As the above quotation indicates,

"[t]he cause of action for breach of the implied covenant of good faith and fair dealing . . . depends

on the existence of an enforceable contract [and,] [i]n the absence of a contract, there is no cause of

action for breach of the implied covenant."  *Ali v. L.A. Focus Publication*, 112 Cal. App. 4th 1477,

1489 (2003).

In his complaint, Mr. Garcia alleges that, "[o]n or about November 15, 1996, [he] and

Amerivine entered into an agreement whereby [he] would purchase bottled wine from Amerivine

labeled with [his] proprietary 'SONOMA RIDGE' brand name and wine label design," FAC ¶ 78,

United States District Court

For the Northern District of California

1   and that Defendants breached the covenant of good faith and fair dealing associated with that

2   contract by stealing and converting the Sonoma Ridge brand name and wine label design.  *See* FAC

3   ¶ 79.  In his declaration, Mr. Garcia provides additional details about the contract.  According to Mr.

4   Garcia, in November 1996, he and Mr. Coleman

> agreed verbally that [Mr. Coleman] would find the wine [Mr. Garcia]
> wanted and [Mr. Garcia] would buy it from [Mr. Coleman].  [Mr.
> Garcia was] interested in bottling and exporting Sauvignon Blanc and
> Chardonnay. . . . [Mr. Garcia] agreed to supply [Mr. Coleman with]
> the labels for [the] Sonoma Ridge brand.  [Mr. Coleman] would get
> approval for the labels and bottle the wine.  [Mr. Garcia] understood
> [he was] to pay for the wine before pick-up.

9   Garcia Decl. ¶ 11.  The same details were testified to by Mr. Garcia in his deposition.  *See* Garcia

10   Depo. at 46-47 ("So the deal with Mr. Coleman was . . . that he would find the wine. . . . [H]e

11   assured me he would find the two wines we wanted, the Sauvignon blanc and the chardonnay, and

12   he would bottle it and we would supply the labels, and that was the deal we made.  And he would

13   bill us for the bottled wine with our label on it ready to go.  So that was our deal.").

14       Based on the declaration and deposition, Defendants argue that they are entitled to summary

15   judgment because the contract between them and Mr. Garcia was limited in scope -- in essence,

16   restricted to the purchase and sale of the Sauvignon Blanc and Chardonnay wines.  Defendants

17   assert that they performed their obligations under the contract -- *i.e.*, bottling and labeling these

18   wines for Mr. Garcia -- and therefore, they did not unfairly frustrate Mr. Garcia's right to receive the

19   benefits of the agreement made.

20       Defendants' position is meritorious.  Mr. Garcia's own declaration and deposition testimony

21   indicate that the contract was limited in scope to the Sauvignon Blanc and Chardonnay wines.

22   Furthermore, even if the contract were broader in scope, Mr. Garcia has failed to show how he was

23   deprived of any benefit of the contract he had with Defendants.  Mr. Garcia has not shown, *e.g.*, that

24   he asked Defendants to provide wine and that Defendants failed to do so.  It was Mr. Garcia's

25   decision not to purchase any more wine.  While any use of the leftover labels was allegedly

26   unauthorized, any such act by Mr. Coleman was not a breach of the contract between the parties.  At

27   most, it was wrongful conduct outside the contract.  Therefore, summary judgment on the claim for

28   breach of the implied covenant is granted.

United States District Court

For the Northern District of California

7.      Conspiracy

As noted above, "[c]ivil conspiracy is not a separate and distinct cause of action under California law.  Instead, it is 'a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration.'"  *Mintel*, 2007 U.S. Dist. LEXIS 59946, at *11.  All of the state law claims have been disposed of on summary judgment and, therefore, the conspiracy doctrine is not viable in this case.  As noted above, to the extent Mr. Garcia alleges a civil conspiracy claim based on copyright infringement, which has survived summary judgment, that claim is preempted.  *See* note 7, *supra*.

### III.    CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Defendants' motion for summary judgment.  All claims are dismissed except for the claim for copyright infringement.  As the copyright infringement claim is asserted against only David Coleman and Amerivine, Inc., Ann Coleman is hereby dismissed from this case.

This order disposes of Docket No. 46.


IT IS SO ORDERED.


Dated:  September 8, 2008

_____
EDWARD M. CHEN
United States Magistrate Judge